Mr. Vandenberg. Thank you, Your Honor. May it please the Court, this is the case involving AGA's patent on an improved septal occluder, which are devices that close unwanted openings inside the heart. And the appeal involves the limitation in Claim 20 of AGA 738 patent that one end of the device has a means for securing the device to the delivery system. One end of the device? That's what it says. It says the device has two different ends and one end of the device has a means for securing the device to the delivery system. Now I, like one of the earlier advocates today, I'd like to take the somewhat unconventional approach of starting with the infringement analysis and then step back to claim interpretation. And the reason I'd like to do that is because even if we accept Gore's identification of the corresponding structure, the clamp or the threaded bore, AGA's expert still undisputedly analyzed that structure and he did so correctly. So summary judgment was incorrect. Come back to this one end of the device. Where is that language? Claim 20 of the 738 patent says that the device has proximal ends and proximal ends of the proximal end and a distal end, wherein at least one of the proximal and distal end include means for securing said device to a delivery system. That was in column 13, starting at about line 43. And this, I think the point here is going to become important today, Your Honor. Because first of all, and I'd like to use these charts if I could, the place to start is that Gore admits that the clamp with the threaded bore, that structure, is this thing right here, this red thing. It's a simple tube with a threaded hole through the middle of it. And what this shows in the example of Figure 7 is that this clamp is part of the device. The device is made up for the embodiment of this metal mesh that the device also has two clamps. So the device has these clamps. So then when the claim says we're claiming a means for securing the device to the delivery system, we're only talking about the interface between this end of the device and this end of the clamp. Why is that true? When the claim says it could be either end, at least one of the proximal and distal ends, doesn't that suggest that either end could be used for securing? As you can see, there are two of these clamps. The device, but again, the device has two clamps. So you are certainly correct. The threaded rod of the delivery system could come in at this end or it could come in at this end. But the important point is that regardless of which way it might be, the securing is done at one end of this device. One portion of this clamp is what actually does the securing function. Why is that true? You have this threaded bore. Why isn't it, according to the structure described in the specification, requiring that the securing function includes securing at both ends of the threaded bore? Because that, the other end of this structure is that it's grabbing onto the rest of the device. It's not securing to the delivery system. It is a part of the device that is attaching, you know, and at this end we have one part of the device attaching to another part of the device. Would it be fair to say that instead of one end, you could say either end? Well, if you're talking about either end of the device, I agree with you. In terms of either end of this clamp, I would disagree with you. You know, because you don't have a device until this clamp is attached to the device. And at that point, you don't have a choice of which end of the clamp. You do have a choice when you attach it. Well, when you're forming a device, in theory, yeah. When you're creating this device, you could But in theory, it matters, yeah. Yes. But the claim is directed to a device. We've got to start with the premise that we have a device. And we don't have a device until we've already attached these at either end. Yeah, but let me tell you what the problem is. If you look at the specification, column 10, line 29, it says the clamps 30 and 32 tied together the wire strands at corresponding ends 26 and 28 also serve to connect the device to the delivery system. And when I read that, it seems to me that this means for securing requires a connection at both ends of the wires and one directly to the delivery system. Why is that a misinterpretation of the structure here? So that under that interpretation, the structure would include the securing at each end of the threaded board? For a number of reasons. One is because it's contrary to the claim language. The claim language says we're only concerned about the way we're attaching the device to the delivery system. But the threaded board is between the device, the occluding device, and the delivery system, correct? I'm sorry, say that again, Your Honor? The threaded board, one end is attached to the occluding device and the other to the delivery system, right? No, Your Honor, I disagree with that. One end is attached to the metal wires. But the metal wires is not the device. That's, I think, where I'm trying to make a difference. One end is connected to the wires and one end is connected to the delivery system. When it speaks of the means of securing, why doesn't that suggest that both ends have to be connected in order to secure the device to the delivery system? I'm reminded for example... You do understand what I'm saying, right? I do. But the point, Your Honor, is of course you don't have a device unless the entire device has to be connected to every other part of the device in order for them to hold together. You know, in this preferred environment, this is made of metal mesh. It's woven together. And if we didn't weave those strands together, you wouldn't have a device. I don't think you're addressing my concern. It seems to me you're arguing that the end of the threaded board that connects the wires is designed to prevent fraying of the wires. Fair enough, that's true. But our precedent also makes clear that a structure and a specification can serve more than one function. And the argument is that here that is true, that the end of the threaded board is preventing the fraying. That's one function. But it is also performing the securing function. And that part of the specification that I read to you appears to say that. No? What I would say is what it's making clear is that there are two separate functions going on. And I agree that the paragraph on Claim 10 is sort of the key paragraph here. The beginning of the paragraph starts by saying the one function. It says that the ends of the fabric are held together. Yeah, but you've got to focus on line, the sentence I read to you on line 29. Doesn't that suggest that the clamps are doing two functions? It doesn't say it explicitly, the fraying, anti-fraying, and the connection. Your Honor, again, we don't dispute that these clamps are performing both functions. But really the heart of the question, and I think I do agree with you on this, the heart of the question is whether this whole structure performs the claim securing function or whether it's just the end that receives the threaded rod that performs the securing function. Here's another way of possibly addressing my concern. And it's based on what I think is Judge Dyke's premise here. Clamps 30 and 32, is there somewhere in the spec that says clamps 30 and 32 are part of the occluding device? Because right now there's one way to look at this patent and say that the clamps 30 and 32 are not necessarily, they are not part of the delivery system, nor are they part of the occluding device. They serve kind of like a securing bridge between the delivery system and the occluding device. And so therefore, because they're not one or the other, the whole clamp is the means for securing the occluding device to the delivery system. However, if you have something in the spec that says these clamps are part of the occluding device, then it gets a little muddier to say, well, then the whole clamp is, maybe you're on better ground to say it's just the end of the clamp that's serving as the means for securing and not necessarily the other end of the clamp that's tying down the threading wire. And I can answer your question. Let's start with the summary of the invention. And I'll start with a paragraph that begins in column three about line 43. It's actually the second sentence. It says the device has a relaxed low-profile configuration and includes clamps. It's very clear saying the device includes clamps. The clamps are part of the device. And in addition, of course, the specification would be the secondary source here. The number one source is the claims. What do the claims say? Because at the end of the day, that's what controls. And the claims here are claiming a device and very clearly say that the securing means is a part of the device. And I'm sorry if I'm, you know, I seem to be missing you here. I don't follow where that gets you. If you were, if we were to say to you that the structure that relates to the securing function is both ends, both the end of the threaded board that connects to the wires and the end that connects to the rod, you would lose, right? That is correct, Your Honor. Our expert did not attempt to analyze how the securing means attaches to the rest of the device, again, because it is part of the device. And if we get to the, to my next chart, this is the one that compares what, again, the clamp is with the structure analyzed by the expert. And this goes to your point. The expert, in our view, correctly focused only on the way, he was undisputedly analyzing the structure that we all agree is the clamp. But he only analyzed the way that it engages the delivery system because that is the clamp function. Now, I was reminded a bit of the dispute in the assist technology. Your expert is Dr. Bhattacharya. Bhattacharya. Dr. Bhattacharya says that the devices perform the function in different ways. One's popping, one's twisting, one's popping out. So, popping and flared mandrel. By definition, I mean, we are not asserting it has the same structure. We are asserting it has the equivalent structure. So, the issue is whether it performs substantial, or it has to perform identical function. And I don't think anybody disputes that the eyelets in the Gore device perform the same function of securing to the delivery system. The question is whether they do so in substantially the same way, substantially the same result. And as Dr. Bhattacharya analyzed in detail. I have one more check. This will be all of them. Here's his comparison of the two structures. And he explained in detail how both a pop-out connection and a threaded connection both operate by creating an interference fit between two surfaces. And I think this was part of the district court's concern. Is that Dr. Bhattacharya and diagrams like this have really kind of abstracted out from the overall context of your structure versus the accused product structure. The notion of threading versus the notion of some kind of force fit. And it didn't, and so therefore your expert failed to take into account the larger context. This threaded bore is inside some sort of cylinder that's on the very end of your occluding device. Unlike the accused product helix where there's multiple eyelets that run throughout the entire occluding device there. And so there's multiple contact points. And it runs through the entire device unlike yours which is just this one little screw on, screw off thing on the very end where there's a cylinder on the very end of the overall device. I don't think the judge was concerned at that level of detail. The judge, I think, didn't like the fact that he didn't use the word detail. I'm sorry. Yeah, yeah. And that's, so I won't try to talk about what the district court was thinking. I will address that more directly. Again, by definition, when we're talking about equivalence, it doesn't need to be identical. It just has to be operating in substantially the same way. And, you know, again, in some sense, perhaps he should have shown this longer or shown more of these. But this was enough to get across the point of what is the fundamental interaction between the device. Claimed function, device to securing system. The interaction occurs by this sort of an interference bit. And as he stated, you know, he analogized it to the difference between a screw off top on a pop can versus a pop top on a pop can. And that's essentially what we're talking about. This is pop off. This is screw off. You've got three pop off though here in Helix. Well, Your Honor, let me clarify on that. This is actually a deformable mandrel. So once, it doesn't pop back. Once it squeezes down, it squeezes down and it pops off. Right. You've got to get through the right eyelet. You've got to get through the central eyelet. Then you've got to get through the left eyelet. Three eyelets. My point, Your Honor, is. Three pop offs. You don't, no, not three pop offs. Once it goes through the first pop off, it collapses. It doesn't re-expand, so it doesn't need to pop through the next pop off. Does that make sense, Your Honor? The mandrel initially is all the way through the entire Helix device. Correct. So to remove the mandrel from the Helix device, you have to go through a series of operations. It's not just a single pop off. Your Honor, that's where I disagree. In part of it, I think we tend to look at this and understand that this is like the last one. It's gone through a whole bunch of them and we haven't gotten the last one. Right. That is not the case. And that, I think, is the concern I have with your premise. That it's only the last eyelet that serves as the Helix's means for securing. When they have three eyelets, when you're inserting this whole thing into a patient's heart, the mandrel is all the way through all three eyelets. And then when you want to ultimately remove the mandrel, when you want to unsecure the mandrel from the Helix device, you have to remove it from three different eyelets, not just the last one. If I could direct your attention... Am I right about that? Factually, am I right about that? It has to pass through all, but it doesn't need to pop off all three. Does that make sense? In other words, if you read Dr. Bhattacharya's report, he says he's focusing on the distal eyelet. I know that. It compresses. It doesn't re-expand. So once it compresses and passes through the first one, it just passes right through. It doesn't need to re-engage each other eyelet as it comes out. Let's put it this way. The only eyelet that actually prevents detachment is the very first one. Because after that, the mandrel is permanently compressed. It compresses down. So after that point, there is an engagement as it passes through the last three eyelets. But what's the purpose of the other eyelets? That has to do with just forming the overall device, just as the rest of our client is associated with forming the overall device. But in terms of the claimed function of securing to the delivery system, again, that only occurs in our device at one end of this. And in their device, it only occurs at the very first eyelet that it needs to pass through. So that's why Dr. Bhattacharya's analysis was, in fact, not defective, and the summary judgment was inappropriate. I think I've gone over the time. Yeah, we'll give you two minutes for rebuttal. Thank you. Mr. Porodek, am I pronouncing that correctly? Oh, Pradek here. Pradek, thank you. Does your mandrel deform after it is removed from the most distal eyelet? Yeah, the mandrel does get deformed when it pushes through, but as far as I understand, it can continue to have the barrier of the additional eyelets going through after that. So I think our position would be that the eyelets, those three eyelets, secure the device because I think you started to describe it, Your Honor. You have the mandrel passing through the entire device, and the device is made of EPTFE, and it's a single nitinol wire with these helical lines, and it hangs from the device during the delivery, kind of like a shower curtain from a shower rod. So those eyelets are like grommets that keep it secured to the device, along with some other things, during the delivery of it. So in terms of securing function, that all these different parts matter, you're absolutely right, Your Honor. In order for this device to be delivered with integrity, it would need to be secured to all three eyelets throughout the deployment process. Otherwise, you'd have the situation where, for example, if you only had the very end of a shower curtain hanging at the very end of the rod, it would be falling into the patient's body. Right, but during the removal of the mandrel process, is there some kind of frictional interference with the end of the mandrel every time it passes through each of the three eyelets? I'd be hesitant to tell you absolutely one way or the other, but there's no reason. The fact of pulling it through doesn't necessarily mean that you've compressed it enough, that it's also going to have to go through other eyelets. I just don't know the factual answer to that, Your Honor. Once you've removed the mandrel from all three eyelets, is there a way to reattach the mandrel to any part of the helix secluding device? No, you can't reattach it. It's out. There is another piece of thread that they have that they attach at the very end of the device that they would allow. If, for example, it was misplaced, you could pull out the entire device. What is that string there for? That's for this purpose. Sometimes when you implant a device and then you pull it out, sometimes you'll see on your echo that it isn't perfectly placed, and you want some kind of a fail-safe so that you can pull it out of the body at that point. So that stays connected to the catheter until the doctor says, things look good and I can then remove the rest of the device. That string then would come up with the mandrel. So that's the way the structure works. I just think just talking about this, we know this is a very different structure from a clamp with a threaded bore. So I think that we're at the point now where I would like to just go to first principles of claim construction in this context, 112, section F, or paragraph 6, and just we need to go to the patent. And the structure they talked about again and again was a clamp in every single place that mattered. And they did not, for example, talk at any of these meetings about a threaded bore in the device. They always talked about a clamp that performed this function. Do you agree that the securing function has to be performed at both ends of the threaded bore? Absolutely. That is what the patent teaches us. So the idea of securing, I think there is an interesting academic discussion around whether the clamp is itself a part of the device or a separate component. But in order to secure the occluding member of the device, just to go back to what this device is, you have what they talk about in all their claims and in the specification, you have a device that has significant flexibility, spring-like they call it, so that it can be placed in eccentric openings in these things called PFOs, which are septal defects that are not necessarily straight. So the idea behind this invention is that you have a device, the occluder part of the device that has flexibility. And that P stands for patent. What's that? I said that P stands for patent. Right, right. And right, right, it does. Absolutely, it sure does. So that's the occluding member. And the challenge, of course, with delivering something that has this kind of flexibility and instability is you need a place that you can really grab onto it and secure it throughout the deployment process. And so the clamp, as they talk about, and there's language I can point to in a second, the clamp itself performs the function, to be sure, in the preferred embodiment of getting all these different wires together. But it's also critical in securing the device as it's deployed and positioned in the heart. Because, as you can imagine, when you have this kind of unstable spring, you need kind of a handle to hold it with. And so the things that matter for the clamp, in my view, aren't just, and they certainly include this, is that they're attached on both sides. But significantly, it's also a different structure, a different material that is stable, and that allows one to grab a hold onto the device and then deliver it. And there's language in the specification that we quote in our brief, but at the end of column eight, this kind of principle is explained. A threaded clamp attached to the medical device allows, so they're talking about the clamp being attached to the medical device in that situation, so it's almost like a separate structure, allows the operator to control the manner in which the medical device is deployed out of the distal end of the catheter. That's at the end of column eight. And then there's a lot of discussion about the concern that if you're pushing this device out through the catheter because of its spring-like nature, it can sometimes go too far. It just has that elasticity that kind of bumps it a little too far. And so it talks about the importance of having a clamp to try to secure the device during this. And it says, and there's actually an entire paragraph at column eight and nine that you could read, but the critical language is, since the threaded clamp can enable the operator to maintain a hold on the device during deployment, the spring action of the device can be controlled by the operator to ensure proper positioning during deployment. So this gives us some really good context when we get to 10, which Your Honor was talking about, Judge Dyke. That language in 10 is just kind of summarizing all the teachings that we've had in the previous nine columns. And it says, as you pointed out, Your Honor, the clamps 30 and 32 tying together the wire strands at corresponding ends 26 and 28 also serve to connect the device to a delivery system. So it's very clear the entire structure matters. It matters because, of course, the law says it matters. So is it your position then that the patent owner, in order to make an infringement argument against your device, your device has to have some kind of structure that not only is securing the device, the occluding device to a delivery system, but it also has to be tying down some wires to prevent fraying? No, no, Your Honor. Then what is your theory for what has to be in your device or any device to infringe that limitation means for securing? I think that we need, and you said it as well as I've ever heard it, a bridging, what did you call it, a bridge, a securing bridge. You need a separate component, a piece of hardware, exactly as they've described very specifically here, that connects the delivery device on one end and connects whatever that flexible structure is. Let's assume that the wires aren't a limitation for this particular claim. It's still, if you look at claims 20, 23, 30 that are at issue here, they all have to have lateral movement, they have to be resilient, they have to be stretchable. So we are talking about a device that is going to be moving quite a bit. So whatever that device is, this occluder portion of the device, they would have to have the equivalent of a separate piece of hardware that attaches on two sides. And again, these are choices that were made by the patentee as they said, oh, let's use means plus function language. Well, we know that that would be an indefinite claim unless they had clearly identified or associated in the patent a structure. And they get to choose that structure. They could have said just threaded bore, they didn't. They could have said we want a threaded bore in the device, which is the argument that they're making that this structure should be read at. They didn't. Each time from the summary of the invention and the detail of the preferred embodiment, it's clamp, clamp, clamp, clamp, threaded clamp. Sometimes they talk about the threaded bore in the clamp, but the noun, the object is always a clamp. And I think that under the law... What if your device, the mandrel, just stopped at the first eyelet and that was your means for securing? We'd have a closer case? Well, they did not put the case on that way and they did not consider this clamp structure. But I think the problem, my assumption frankly, is that if you think of an intervening bridge structure that is different from the occluding member, we are just so far away from that. We have a single wire device that does not have a separate structure. We do not interconnect delivery system and device in that kind of way that they describe it all. And you've described it well, Your Honor. I mean, I think of it as a curtain rod. And that is just so radically different. In order for them to get to the position where they could have an equivalence position that an expert could talk about and would be credible, they needed to really carve out most of that clamp structure and as opposing counsel just did today, just focus on that one interference fit. Now, we have cases, you have cases, Your Honor, for example, in Portland, which they talk about, where that analogy between an interference fit and a threaded bore is actually found not to sustain as a matter of law, finding of equivalence. But we didn't get to that part because in this case, their expert did the one thing that experts and litigants can't do in our system. It's patent litigation 101. He did not apply the appropriate frame construction to the accused device. And it's over at that point. OK, thank you, Mr. Parodic. Your Honors, I'd like to start briefly by addressing Judge Chin's issue on how did the mandrel engage the styles before I get back to this bridge argument as we're talking about it. On the first point, I just want to point out pages A2948, A2949, factual evidence that must be accepted. It's true. Dr. Bhattacharya says, and this is in paragraph 57, that the firm and quick pull causes the flare of the mandrel to compress. I'm sorry, causes the flare in the mandrel to compress and disengage from the distal islet. The mandrel now passes freely through the three islets. That's factual evidence that must be accepted. It's true. So we aren't talking about engaging, the securing means is not three islets. It's one islet and really just the first part of one islet. Let me go back now to the bridging issue. Again, both the specification and the claims belie their argument that this is a link between the device on the one side and the delivery system on the other. The summary of the invention says the device. How is an expert's analysis, it's certainly expert opinion. How is it factual evidence? Well, it must be accepted as true because we are here on a summary judgment motion. And he is the one who has. It's certainly true that it's his opinion. I accept that. Well, but we are talking about the facts of how their product works. We don't, we would have no basis of knowing that this permanently compresses and not permanently compress if we didn't have some factual testimony. We have that here. Well, you have an expert basis or supposed to base their opinion on underlying facts. But there are underlying facts and then there's the opinion. What you're citing is his statement. But his statement of facts, again, must be accepted as true under the summary judgment standard. So if there's a question, the question is it matters whether this permanently compresses and goes through freely or not. We have evidence in the record that must be accepted as true that establishes that. Now, back to the bridging issue. Again, I think the key point to our argument is that the patent teaches that this is the device. And it says the device has clamps. This whole thing, you don't have a device unless you've got these things on either side. That's what our patent teaches. So when the claims function is securing the device, the delivery system, we're only looking at one end of it. Just like, and I wanted to give the example of the assist case that involved assist technology, involved a processor. And the defendant made the point that, well, a processor can't process information, that was a claims function, without something to give it information. It's got to have input into it. You can't process information without input. And this court said, well, that may be true. But we still have to look at just the structure that actually performs the claims function. OK. Mr. Vandenberg, thank you. I think we're out of time. Thank you. Thank both counsel. The case is submitted. And that concludes our session for today.